UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

_____

NO. 17-CR-10186-DPW

_____

UNITED STATES

v.

JOSEPH GARGIULO
Defendant

_____

**DEFENDANT'S SENTENCING MEMORANDUM**

The defendant Joseph Gargiulo recommends that the Court impose a sentence of time-served, to be followed by three years of supervised release.[1/] The defendant recommends that a condition of his supervised release be that he take part in a residential treatment program to address his substance abuse and mental health issues, as described in the report of Dr. Julia Reade and the presentence report, and that, following the completion of his residential treatment, he take part in after-care treatment as directed by the Probation Department.

## I.    PROCEDURAL BACKGROUND.

### A.    The Offense and Guilty Plea.

On July 27, 2016, Gargiulo's ex-wife reported on www.fbi.gov that Gargiulo had acquired parts to make an AR-15, had been stockpiling food, water, and other weapons, and had made various threats. She reported that he was generally unstable and abusing drugs again. As a result of the online tip, FBI agents interviewed Gargiulo's ex-wife. On August 25, 2016, she called agents to report that

---

[1/]    The defendant has been incarcerated since August 26, 2016, some 13 and one-half months.

another person had seen a partially-assembled AR-15 in Gargiulo's home.

The next day, agents interviewed that individual (a childhood friend of the defendant). They also sought, obtained, and executed a warrant to search Gargiulo's home. Agents recovered 253 rounds of 5.56 millimeter ammunition and 100 rounds of 9 mm ammunition. Although not charged in the information, agents also recovered, *inter alia*, the frame of a partially-assembled AR-15, as well as unmixed chemicals that could be combined to create an explosive and an incendiary device, body armor, numerous weapons, and handwritten notes threatening members of the Muslim community. Gargiulo was arrested on August 26, 2016, and has remained in custody since that date.

Records of the Wrentham, Massachusetts District Court revealed that Gargiulo's ex-wife sought and obtained an abuse prevention order against Gargiulo under M.G.L. c. 209A on June 1, 2016. Paragraph 12 of the order required Gargiulo to surrender any firearms and ammunition to police based upon a "substantial likelihood of immediate danger of abuse." It also warned that possession of any firearms or ammunition while the order was active constituted a violation of 18 U.S.C. § 922(g)(8). According to the records, Gargiulo appeared with counsel in the district court on July 20, 2016 and the order, including paragraph 12, was extended to July 20, 2017.

On July 12, 2017, Gargiulo waived indictment in this Court and pled guilty pursuant to a written agreement with the government to an information charging him with one count of being a person subject to a domestic restraining order in possession of ammunition in violation of 18 U.S.C. § 922(g)(8). He faces a statutory maximum term of 10 years' imprisonment. His sentencing is scheduled for October 12, 2017. He is incarcerated at the Plymouth County Correctional Facility.

## B.    The Guideline Range and Sentencing Recommendations.

The parties have agreed that Gargiulo's base offense level is 20 under USSG §2K2.1(a)(4) because the offense involved a semiautomatic firearm capable of accepting a large capacity magazine and he was a prohibited person at the time of the offense. With the anticipated reduction for acceptance of responsibility under §3E1.1(a)-(b), Gargiulo's total offense level would be 17.[2]

Gargiulo is in Criminal History Category ["CHC"] I, with a six-month continuance without a finding in 2009.[3] From undersigned counsel's review of records disclosed by the government, on January 4, 2009, Gargiulo was charged in the Wrentham District Court with five counts of violating an emergency protective order his ex-wife had obtained the day before, on January 3. The order would have expired the following day, on January 5. According to the police report, the counts corresponded to five text messages Gargiulo's ex-wife alleged he sent the morning of January 4, and thus while the order was active.

Based upon a total offense level of 17 and CHC I, Gargiulo's advisory guideline range is 24 to 30 months.[4] Pursuant to the plea agreement, the government will recommend a sentence at the low-end of the applicable range, 24 months. Gargiulo recommends a sentence of time-served.

---

[2]    But for the seizure of the frame to the incomplete AR-15, Gargiulo's base offense level would be 12 under §2K2.1(a)(7). With a 2-level reduction for acceptance, his total offense level would be 10.

[3]    Gargiulo appears to have also been convicted in 1990 and 1991 for assault and battery with a dangerous weapon. However, these convictions would not be counted under USSG §4A1.2(e) because of their age.

[4]    At total offense level 10 and CHC I, the range would have been 6 to 12 months.

## II.   GARGIULO'S PSYCHOLOGICAL EVALUATION.

Dr. Julia Reade, a licensed psychiatrist, prepared a comprehensive report of her examination of Gargiulo.  Therein, Dr. Reade detailed Gargiulo's background, including his debilitating substance abuse and anxiety and depressive disorders.[5]

Dr. Reade also discussed the progress that Gargiulo has made since his arrest. Dr. Reade reported that Gargiulo has insight into and genuine remorse for his conduct. She identified a number of factors that mitigate his risk of harm to others, which she opines is low, and that strongly suggest an amenability to treatment and oversight by the Court. These include his capacity to exercise good judgment and impulse control and to behave in a law-abiding fashion when he is not abusing drugs, as evinced by his positive response to past court supervision and his lack of any disciplinary record during his present incarceration. The mitigating factors also include Gargiulo's motivation to remain sober and to engage in treatment, as well as his capacity for empathy and desire to be on good terms with his ex-wife and to repair the damage that he has done to his relationship with his sons.

Dr. Reade recommended that Gargiulo enter a long-term, inpatient dual diagnosis program to address his long-standing substance abuse and mental health issues. Given his need for specialized treatment and amenability to rehabilitation, Dr. Reade opined that it would be damaging and of no measurable benefit to continue to incarcerate him.

Dr. Reade met with Gargiulo again on July 18, 2017. By letter dated July 20, 2017, she has updated her report. As set forth therein, Gargiulo has maintained his sobriety and has not incurred any disciplinary infractions. He continues to express remorse and a desire to engage in treatment.

---

[5]    Undersigned counsel respectfully refers the Court to Dr. Reade's report for a more thorough accounting of Gargiulo's background. Counsel has refrained from including too much sensitive information in this public document.

Dr. Reade reports that Gargiulo's mental health is largely unchanged since they last met. He continues to have active symptoms of Major Depressive and Panic Disorder for which he is not receiving any treatment.

Dr. Reade's assessment of Gargiulo's risk of violence or harm to his ex-wife, Muslims, or any others in the community has not changed. His risk is low. He has no thoughts or plans of harming anyone. He has avoided and de-escalated conflict in jail and has demonstrated a capacity to comply with rules. He has empathy for others and forms meaningful attachments. All of these are protective factors that predict an ability to benefit from treatment and rehabilitation.

III.    **THE COURT SHOULD SENTENCE GARGIULO TO TIME SERVED AND ORDER HIS PARTICIPATION IN A LONG-TERM, INPATIENT DUAL DIAGNOSIS TREATMENT PROGRAM.**

Dr. Reade's comprehensive report paints a clear picture of the circumstances that led to Gargiulo's serious offense and disconcerting relevant conduct. That picture is of long-standing, debilitating substance abuse and anxiety and depressive disorders, each fueling the other and both fueling his behavior. Before his arrest and incarceration, neither was adequately addressed by Gargiulo or the professionals from whom he sought help.

As set forth in the report, Gargiulo's father was tough, set high standards, and valued presenting a good appearance to the outside world even when struggling. He instilled in Gargiulo a deep insecurity and the fear of seeking help. Gargiulo's mother was warmer, but drank. Gargiulo's youngest sister suffered from Bipolar Disorder or Schizophrenia and substance abuse issues. She was often violent, resulting in a chaotic and conflict-ridden household. Gargiulo's only brother suffered from depression and substance abuse issues. He would die in 2005 from an accidental overdose. Their sister would die in 2009 from cancer. Gargiulo harbors guilt for both of their deaths.

Gargiulo was an anxious child with learning disabilities who often resolved conflicts physically. He began drinking at 15, and abusing opioids in college. Although his graduation from Northeastern University was preceded by a period of sobriety and achievement, Gargiulo's substance abuse worsened as he encountered stresses in his personal and work lives. By 2003, when he was 35, Gargiulo was abusing alcohol, benzodiazepines, and opioids. The substance abuse would contribute to the collapse of both his marriage and his businesses.

When he was in his thirties, Gargiulo began having severe panic attacks, often coinciding with work stress. He used opioids to manage these symptoms. Gargiulo's depression worsened as marital stress intensified. He turned to substances to deal with these symptoms, too. From 2003 to 2005, Gargiulo sought treatment intermittently for his substance abuse and mental health issues. Treatment was initially helpful. But Gargiulo was not engaged and he would eventually relapse.

By 2008, Gargiulo's marriage had ended and his businesses had dissolved. That year, he sought help again and was treated by a psychiatrist with an aggressive (and dubious) course of Suboxone, an opioid, and Klonopin, a benzodiazapine. The deaths of his siblings, the end of his marriage, and dissolution of his businesses left Gargiulo with no hope for rehabilitation. Around 2012, his dependency on Suboxone and Klonopin caused his behavior to become sufficiently erratic that he stopped working altogether. Apart from his weekly visitation with his sons, Gargiulo had no structure in his life and little incentive to change. The despair and lack of structure drove his substance abuse to greater heights.

Around 2012 or 2013, unemployed and abusing drugs heavily, Gargiulo became fascinated, and frightened, by doomsday-type conspiracies. He watched television programs and read materials online that not only fostered prejudicial beliefs against Muslims, but also convinced him that society

would collapse and that civil war would erupt and a majority of the population would be left helpless and starving.  In response, he began collecting food, water, and other supplies to prepare for this disaster.  He built "go bags" --  backpacks filled with essentials for survival in the wilderness -- for him and his sons.[6] Eventually, he also bought weapons for their defense, culminating with the gun parts. As Dr. Reade recounts in her report, Gargiulo bought these items to protect his sons and himself, not to hurt anyone. It was simply that, the more weapons he had, the safer he felt.

In 2014, Gargiulo began treatment with a family practitioner who quickly and without scrutiny accommodated his requests for more medications at higher doses. The family practitioner also prescribed him testosterone. Gargiulo subsequently added anabolic steroids and mushrooms to the mix. Presumably because of the testosterone and anabolic steroids, he became far more irritable and aggressive.

The family practitioner's records reveal that, in February 2016, Gargiulo reported that he was worried about the economy, that government authorities were not doing their jobs, and that terrorists were being trained in camps. Dr. Reade writes that Gargiulo's "alarming presentation and thought content" should have triggered concern that he was becoming hypomanic, depressed, psychotic on his medications, or was deteriorating psychologically for some other reason. Apparently, however, they did not.

The family practitioner's records also reveal that, in June 2016, Gargiulo reported increased distress over his ex-wife's restraining order and despair over the termination of his visitation rights. He described himself as depressed and severely anxious. Yet, the family practitioner apparently did

---

[6]      Apparently, "prepping" and fears of a chaotic breakdown of societal norms is not limited to drug-addled mentally ill people. *See* Osnos, *Doomsday Prep for the Super-Rich, The New Yorker*, Jan. 30, 2017.

not recommend any different or additional treatment.

At the time of his arrest, Gargiulo was physiologically and psychologically dependent on Suboxone and Klonopin. He was taking these medications at "shockingly" high doses. And he was using testosterone, anabolic steroids, and hallucinogens. After his arrest, Gargiulo required medical intervention, twice, to safely detox from the Klonopin.

Dr. Reade concludes that Gargiulo was in a drug-addled state for many months, if not years, before his arrest and that the cocktail of medications that he was prescribed and which he supplemented with anabolic steroids and hallucinogens was sufficient to make him confused, disoriented, disinhibited, irritable, and even to induce delirium. The substance abuse, coupled with his isolation and his immersion in conspiracy theories, pulled Gargiulo into a distorted and paranoid vision of the world where he and his sons were in imminent danger and he needed to take steps to protect them.

Gargiulo did not experience real sobriety until his arrest. With his sobriety has come frank recognition of the severity of his conduct and the harm that he has caused others, especially his sons, as well as frank recognition of his need for treatment. Gargiulo has expressed abhorrence for the views that he espoused and has vehemently denied any intent to harm. According to Dr. Reade, Gargiulo's experience is consistent with drug intoxication and substance abuse; "[w]hile in the grip of substances, an individual feels and thinks things that are alien and repellant to him when sober."

Ultimately, with his continued sobriety and release to a long-term, inpatient dual diagnosis program where he will be both supervised and immersed in appropriate treatment for his substance abuse and anxiety and depressive disorders, Garguilo is not a danger to any person or the community. Dr. Reade opines that his risk of violence is low. Gargiulo is motivated to engage in treatment and

to rectify the harm that he has caused.

Garguilo's advisory guideline range is 24 to 30 months. He has already served over half the term that the government is expected to recommend.  He is ready to engage in treatment, aware that it is the only means by which he can rectify the harm that he has caused his family and himself. Although serious, his conduct was precipitated by extensive substance abuse and serious mental health issues that were not adequately addressed by either Gargiulo or the professionals from whom he sought help. The progress that he has made since his arrest strongly suggests that he will thrive in treatment and maintain his sobriety and effectively manage his anxiety and depressive disorders moving forward.

## IV.     POTENTIAL DUAL DIAGNOSIS PROGRAMS

In connection with his motion for release pending sentencing, the defendant applied for admission to the Fernside Program operated by McLean Hospital. He was not accepted. The admitting psychiatrist informed Dr. Reade that he was not an appropriate candidate in light of the possibility of electronic monitoring,[7] his prior history of violence, and threats against his ex-wife and Muslims, especially because the program at times treats women with PTSD and Muslims.

The defendant presently has an application pending for admission to the Spring Hill Treatment Center in Ashby, which is one of the alternative programs suggested by the psychiatrist at Fernside. The Fernside psychiatrist also recommended Gosnold, which has treated many federal defendants, both those waiting trial and those on supervised release.

---

[7]     Magistrate Judge Cabell had instructed the Probation Department to determine whether the program could accommodate electronic monitoring should he be released.

## CONCLUSION

For the foregoing reasons, Gargiulo asks that the Court sentence him to time served and direct that the initial portion of his supervised release be spent in a dual diagnosis inpatient substance abuse and mental health treatment program and upon any other conditions that the Court deems appropriate. The defendant recommends that he receive three years of supervised release and pay a $100 special assessment. The defendant asks that the Court refrain from imposing a fine and instead order that defendant pay for the cost of his inpatient and follow-up treatment.

Respectfully submitted,
**JOSEPH GARGIULO**
By his counsel,

/s/Charles W. Rankin
Charles W. Rankin
BBO No. 411780
Rankin & Sultan
151 Merrimac St.
Boston, MA 02114
(617) 720-0011

## CERTIFICATE OF SERVICE

I hereby certify that this document(s) filed through the Electronic Filing System (CM/ECF) will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-participants on October 10, 2017.

/s/Charles W. Rankin
Charles W. Rankin